## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                    Case No. 18-cr-180-PAM-KMM

                          Plaintiff,

v.                                                      **REPORT AND**
                                                        **RECOMMENDATION**

RYAN ISIAH THOMPSON (1),

                          Defendant.

This matter is before the Court on two suppression motions filed by Ryan Isiah Thompson: (1) Defendant's Pretrial Motion To Suppress Statements, Admissions, Answers And Evidence That Is The Fruit Of Such Statements, ECF No. 24; and (2) Defendant's Pretrial Motion to Suppress Search and Seizure, ECF No. 25. The Court held a hearing on these motions on October 22, 2018, at which St. Paul Police Officers Shawn Longen and Jason Whitney testified and the Court received several exhibits into evidence.[1] The parties filed post-hearing briefing.[2] For the reasons that follow, the Court recommends that Mr. Thompson's motions be granted/denied.

## I.    Background

Officer Longen is assigned to a narcotics unit of the Ramsey County Violent Crimes Enforcement Team ("VCET") as a K-9 handler. Tr. 7:9-13. He investigates violent crimes and narcotics-related offenses in the Twin Cities.

---

[1]    Mins., ECF No. 31; Tr. of Oct. 22, 2018 Hr'g ("Tr."), ECF No. 36.

[2]    Def.'s Mem., ECF No. 40; Gov't's Resp., ECF No. 41; Def.'s Reply, ECF No. 44.

Tr. 8:4–8. In that role he began investigating Mr. Thompson's suspected involvement in distribution of controlled substances in February of 2018.

Officer Whitney also works in the St. Paul Police Department as a K–9 officer and conducted a traffic stop of Mr. Thompson's vehicle on May 6, 2018 at the direction of the VCET narcotics unit. Tr. 58:10, 60:13–62:1. Both officers testified about their involvement in the investigation of Mr. Thompson.

### Initial Meeting with Person ABC

Around February 11, 2018, Officer Longen was contacted by a "concerned citizen"[3] with information linking Mr. Thompson, among others, to the distribution of heroin in St. Paul. Tr. 8:16–22, 9:7–10:1. Officer Longen stated that when ABC came to him with information, he "said he wanted to do the right thing," and did not request any payment. Tr. 46:6–13. Around March 7, 2018, however, ABC became a paid informant. Tr. 8:25–9:2, 43:23–44:1. Sometime in mid–March, ABC also told Officer Longen that he provided information because he wanted Officer Longen to speak to his probation officer about reducing his probation time. Tr. 52:6–11. ABC has a criminal record and one of his convictions requires him to register as a sex offender. Tr. 46:14–19.

In their initial meeting, ABC told Officer Longen that Mr. Thompson would often drive from St. Paul to Chicago to pick up large amounts of heroin from a source there and bring it back to the Twin Cities for distribution. *See* Tr. 10:2–10; Tr. 63:2–7. ABC explained that Mr. Thompson would also occasionally take the Megabus from the Twin Cities to Chicago and back. Tr. 11:19–12:1. ABC said that Mr. Thompson had been arrested in Illinois and Minnesota for drug–related crimes. Tr. 12:2–5.

---

[3]    The parties referred to this individual as "ABC" for purposes of the suppression hearing. Tr. 9:3–6. The Court uses ABC to identify this individual in this Report and Recommendation.

ABC also told Officer Longen that Mr. Thompson was driving a silver Saturn station wagon at the time, that the vehicle would be parked at an apartment building on 677 Wells Street where Mr. Thompson lived, and that Mr. Thomson had "a couple firearms" that he kept at his apartment. Tr. 10:11–11:4. He had also seen Mr. Thompson driving a green Nisan Maxima with the license plate AKS 913. Tr. 11:5–13. ABC shared some recent videos that ABC had taken of Mr. Thompson in his apartment, and in the footage Officer Longen saw stacks of money on a black case, a black handgun, and another firearm that appeared to be a TEC–9 or MAC–10 style gun. Tr. 12:6–22. In the same videos, Mr. Thompson could be seen sitting on a couch with baggies containing "what appeared to be controlled substances sitting next to him." Tr. 12:6–16.

After the initial meeting with ABC, Officer Longen attempted to confirm the information he received. Officer Longen was able to verify Mr. Thompson's age, which ABC had also discussed. Tr. 13:16–20; *see also* Gov't Ex. 1 at 2 (indicating that a background check on Mr. Thompson returned his date of birth, corroborating information provided by ABC). He checked the license plate ABC provided and learned that the green Nissan was registered to Mr. Thompson, though it was registered at an address on Robert Street, not Wells. Tr. 13:5–13. Officer Longen sent ABC an unmarked picture of Mr. Thompson, which ABC confirmed was the person he had identified as being involved in distribution of heroin. Tr. 13:21–14:1. Officer Longen checked Mr. Thompson's criminal history and verified that he had arrests in Illinois and Minnesota for drug–related offenses. Tr. 14:4–9. He also began conducting surveillance of the apartment building at 677 Wells and saw Mr. Thompson driving the green Nissan Maxima. Tr. 14:13–17.

### Wisconsin State Patrol Traffic Stop and ABC's Recording

Later in February of 2018, ABC told Officer Longen that Mr. Thompson had been stopped by Wisconsin State Patrol ("WSP"). Tr. 14:23–15:1. Officer Longen contacted WSP and verified that Mr. Thompson had been stopped

on February 26, 2018 while driving the green Nissan Maxima eastbound on Interstate 94. Tr. 15:5–17. WSP arrested Mr. Thompson for possession of marijuana and his car was towed. Tr. 8:13.

Shortly after the WSP traffic stop, on February 27th or 28th, ABC made a secret recording of a conversation he had with Mr. Thompson. Tr. 15:21–24, 17:5–10. In that conversation, Mr. Thompson discussed the WSP trooper making contact with him during the traffic stop, explained that he had marijuana in the car and on his person, and stated that the stop would have been "much worse" for him "if he would have had the work with him." Tr. 16:1–12. Officer Longen testified that "work" is a common term used to describe drugs. Tr. 16:1–12. Mr. Thompson talked to ABC about "licks," a term used to refer to customers by a person who deals drugs, and "zips," which is a slang term for ounces. Tr. 16:1–12. He also discusses having a "whoop," which is a slang term for a gun, locked inside his glovebox at the time of the WSP stop. Tr. 16:13–22. Mr. Thompson stated that on his return trip, he was speeding, and if he had been stopped again he would have told police that he was irritated by the previous stop. Tr. 16:13–22.

### February 28th Tracking Warrant and Order

Based on the information he had received from ABC and his own corroboration of certain details, on February 28, 2018, Officer Longen wrote an application for a search warrant to place a GPS tracking device on the green Nissan Maxima. Tr. 19:14–23; Gov't Ex. 1. In the application for the tracking warrant, Officer Longen explained that ABC, a "Concerned Citizen," stated that Mr. Thompson was involved in the sale and distribution of heroin. Gov't Ex. 1 at 2. ABC knew Mr. Thompson's name, approximate age, and provided a description of his appearance. *Id.* Officer Longen explained that ABC: (1) identified Mr. Thompson's silver Saturn vehicle; (2) said that he lives at 677 Wells and uses the location to store heroin; and (3) said that he is known to possess and carry firearms. *Id.* Officer Longen also stated that ABC said

Mr. Thompson purchased a green Nissan Maxima and used it to take trips to and from the Chicago area to pick up heroin from a source. *Id.* The application states that ABC knew details about Mr. Thompson's criminal history, including drug-trafficking arrests in the Chicago area. *Id.* at 2, 3.

Officer Longen's affidavit describes the details he was able to corroborate from ABC's statements. He confirmed the green Maxima was registered to Mr. Thompson at a Robert Street address. Gov't Ex. 1 at 2. He corroborated ABC's information about Mr. Thompson's age and appearance. *Id.* Officer Longen stated that surveillance at the Wells apartment revealed that Mr. Thompson was driving both the green Maxima and the silver Saturn station wagon, further confirming information provided by ABC. *Id.* Officer Longen was also able to verify that WSP had conducted a traffic stop on February 26th and that Mr. Thompson was arrested for possession of marijuana. *Id.* at 3. And Officer Longen states that a criminal history check corroborated information provided by ABC about arrests for drug-related offenses. *Id.* Based on this application, Ramsey County District Court Judge Joy Bartscher authorized the installation of the GPS tracking device on the green Maxima. *Id.* at 4.[4] The warrant permitted the tracking for a period of 60 days. *Id.* at 5. The application for the GPS tracking device does not mention the recording ABC made of his conversation with Mr. Thompson following the stop by WSP. Nor does the application mention the videos ABC provided to Officer Longen at their initial meeting.

On February 28th, Officer Longen also wrote an application for an "order authorizing the installation and use of a pen register, trap device, and electronic tracking device" on a cellular phone with the number ending in 0727. Tr. 19:14–23; Gov't Ex. 2. The application for this order is based on similar information

---

[4]     Judge Bartscher originally signed only the affidavit that Officer Longen provided, but did not sign the warrant. However, the Judge later signed the search warrant, noting that it had been approved and issued on February 28th. *See* Gov't Ex. 5; Tr. 29:21–31:10.

from ABC that led to the tracking warrant for the green Maxima.[5] *Id.* at 3-4.
Officer Longen's affidavit corroborated details ABC provided about:
(1) Mr. Thompson's name, age, and appearance; (2) his vehicles; (3) his
presence at the 677 Wells apartment; and (4) his criminal history. *Id.* Officer
Longen's affidavit states that ABC said Mr. Thompson uses the 0727 phone
number to conduct narcotics trafficking and that he communicated with
Thompson using that number. *Id.* at 3. Officer Longen further states that he
checked the phone number through a police database that showed it was
registered to "Mike Jones" at a non-existent address in St. Paul, but in his
experience, people involved in trafficking narcotics commonly use false names
and addresses to conceal their identities. *Id.* at 4. Based on this information,
Judge Bartscher issued the Order authorizing the police to track the cell phone.
*Id.* at 6-7. This application does not mention either the videos ABC provided to
Officer Longen at their initial meeting or the secret recording ABC made of
Mr. Thompson following the WSP traffic stop.

### March 5th Traffic Stop

ABC continued providing information to Officer Longen about other
individuals and Mr. Thompson on an ongoing basis through May of 2018.
Tr. 16:25-19:1. As to other targets, ABC provided information that Officer
Longen was able to verify, including details regarding an individual who was
being investigated by the United State Bureau of Alcohol, Tobacco, Firearms,
and Explosives. Tr. 19:8-13. With respect to Mr. Thompson, ABC gave Officer
Longen updated phone numbers when Mr. Thompson would change them.
Tr. 19:2-6. ABC also discussed Mr. Thompson's "day-to-day activities if he
knew [Mr. Thompson] was at a certain location...." Tr. 19:6-8.

---

[5]     The application for the phone order describes the Maxima as being "black
in color," rather than green. Gov't Ex. 2 at 3.

ABC told Officer Longen in early March of 2018 that he believed Mr. Thompson was running out of product and would be making a trip to Chicago to pick up heroin to bring back to the Twin Cities. Tr. 21:1-7. The GPS tracking device that Judge Bartscher had approved for the green Maxima was then placed on the vehicle on March 4, 2018. Tr. 20:16-18. At 2:30 a.m. on March 5, 2018, the GPS tracking device indicated that the green Maxima was heading east on I-94 toward Chicago. Tr. 20:19-23, 21:8-12. When it arrived in Chicago, the vehicle remained there for 20 minutes and then began heading west back toward St. Paul. Tr. 21:13-24.

Believing the vehicle might contain illegal drugs, St. Paul police stopped the vehicle on I-94. Tr. 21:25-22:5. Officers had Mr. Thompson exit the vehicle and called for a K-9 to sniff the car. The dog alerted on an odor of marijuana in the center console. Tr. 22:24-23:6. Law enforcement searched the car, but did not locate anything of interest. Tr. 23:5-6. Nothing was seized, and Mr. Thompson was allowed to leave. Tr. 23:7-16.

### March 6th Recording

On March 6, 2018, ABC provided Officer Longen a recording of Mr. Thompson discussing this traffic stop. Tr. 23:17-24. During the 20-30 minute recording, Mr. Thompson states that he believed he is under investigation and law enforcement may be monitoring his phones. Tr. 24:3-11. Mr. Thompson discussed his suspicion that people were informing on him and distancing himself from people, including ABC. Tr. 25:16-19. He also discussed "letting things cool off" during a 90-day period that he believed law enforcement had to investigate him. Tr. 25:19-22.

Mr. Thompson explained to ABC that he noticed surveillance vehicles following him on I-94 because he had been speeding and cars behind him were attempting to keep up. Tr. 24:11-17. He stated that he attempted to exit on White Bear Avenue to see if these other vehicles would follow him. Tr. 24:17-19. Mr. Thompson also repeatedly discussed having "a hundred on

me," and questioned "what if law enforcement would have found that." Tr. 24:20–25:2. He told ABC that he was worried when the dog alerted on the vehicle and thought he would not see his family again. However, he believed that the officer searching the vehicle had been unable to find where the heroin was hidden because he was wearing gloves. Tr. 25:3–11. Mr. Thompson also discussed on the recording how good his product is and how he can provide "the best dope for the cheapest price." Tr. 26:2–4. He described mixing drugs with other substances to maximize profit. Tr. 26:4–9.

### April 2nd Tracking Warrant and Order

ABC told Officer Longen in early March that Mr. Thompson had purchased a newer Nissan Maxima that was silver and had tinted windows and that he obtained a new phone number ending in 3045. Tr. 27:3–16. ABC said that Mr. Thompson left the green Maxima in Chicago because the car had been stopped twice. Tr. 27:3–9. Officer Longen contacted a person in the United States Drug Enforcement Agency in Chicago, who confirmed that the green Maxima was parked overnight at addresses associated with Mr. Thompson in an area where a gang called the "Four Corner Hustlers … is known to control the distribution of heroin." Tr. 28:22–29:5. Officer Longen conducted surveillance again at the 677 Wells apartment building and saw Mr. Thompson pull up behind the building in a silver Maxima, exit the vehicle, and go into the apartment. Tr. 28:6–13.

Based on this new information, Officer Longen applied for a warrant to install a GPS tracking device on the silver Maxima and for an order authorizing the tracking of the phone with the number ending in 3045. Tr. 29:9–14; Gov't Exs. 1 & 2. In the application for the silver Maxima tracking warrant, Officer Longen repeats much of the information he learned from ABC that led to the original tracking warrant for the green Maxima. Gov't Ex. 3 at 2–3. Officer Longen also shared the updated information he learned, including that: (1) ABC told him Mr. Thompson had a newer silver Maxima with tinted windows;

(2) surveillance indicated Thompson drove the vehicle to the 677 Wells apartment; and (3) the DEA confirmed the green Maxima had been left overnight at addresses associated with Thompson in an area controlled by gangs involved in the distribution of heroin. *Id.* at 3. This application did not mention the March 5, 2018 traffic stop and search of the green Maxima that resulted in no seizure of contraband. Judge Bartscher approved the GPS tracking warrant on April 2, 2018, authorizing the installation of the device and monitoring for a 60-day period. *Id.* at 6-7.

The application for an order authorizing tracking of the new phone number ending in 3045 similarly repeated the information Officer Longen obtained from ABC that led to the previous phone tracking order. Gov't Ex. 4 at 2-4. Officer Longen explained that ABC had changed his phone number and began using the number ending in 3045 in connection with the distribution of narcotics. *Id.* at 3. The application also stated that a check of the number in the police database showed it registered to "Mike Jones," which was the same name associated with the 0727 number that was tracked pursuant to the February 28, 2018 order. *Id.* at 4. This application did not include the new information Officer Longen learned from more recent communications with ABC, nor the results of the March 5th traffic stop. On April 2, 2018, Judge Bartscher signed the Order authorizing the tracking of the cell phone associated with the 3045 number for a 60-day period. *Id.* at 6-7.

### Subsequent Tracking and Surveillance

Officer Longen placed a tracker on the silver Maxima on April 5th. Tr. 31:12-14. On April 13th, Officer Longen saw that the tracker went down to the Union Depot station in downtown St. Paul and surveillance video that day showed that Mr. Thompson boarded the Megabus bound for Chicago. Tr. 31:15-25. On April 16th, the tracker showed that the silver Maxima returned to the Union Depot. Tr. 32:1-4. That afternoon, Mr. Thompson returned from a bus trip, got in the Maxima, and left. Tr. 32:5-9. The tracker also showed that

the silver Maxima traveled to Chicago on April 20th and returned on April 22nd. Tr. 32:10–17. Officer Longen did not arrange for another stop of Mr. Thompson for either of these events because he did not review the tracker data and surveillance video from the bus trip until it was too late. Tr. 32:18–33:3.

On May 1st or 2nd, officers conducted loose surveillance of Mr. Thompson driving around in the silver Maxima. Tr. 33:12–34:14. Officers saw Mr. Thompson make several very short stops at an intersection and at two different gas stations. Tr. 33:13–23. They also observed him pull into a Target store parking lot in Roseville for a short period of time. Tr. 33:23–25. Mr. Thompson then drove to the Midway Target in St. Paul, where he passed by the front of the store very slowly, leading Officer Longen to conclude that he was trying to see if anyone was following him. Tr. 33:25–34:12.

On May 3rd, the GPS tracker showed that the silver Maxima drove back to the Union Depot. Tr. 34:15–18. Officer Longen was interested in this because he knew that Mr. Thompson took the Megabus from Union Depot to Chicago, and suspected that he picked up heroin on those trips to transport back to the Twin Cities. Tr. 34:21–25. The phone tracker for the number ending in 3045 was observed at the Union Depot as well, and then it "pinged," indicating that it was heading toward Chicago. Tr. 35:1–8. Further tracking of the phone indicated that it remained in Chicago for a few days and then headed back toward St. Paul along the I-90/I-94 corridor. Tr. 35:9–19.

### May 6th Traffic Stop

Believing that Mr. Thompson would be returning to the Union Depot in St. Paul carrying heroin he obtained in Chicago, on May 6, 2018, Officer Longen contacted other VCET members to set up surveillance at Union Depot and waited for the Megabus to arrive. Tr. 35:20–36:2. Mr. Thompson was seen getting off the Megabus carrying a single sling-style bag that was "a camouflage-tannish color." Tr. 36:10–15. Around that same time, the silver Maxima pulled into the parking area below the Union Depot station, which

10

officers saw was driven by a female. Tr. 36:16-20. Officers saw Mr. Thompson get into the driver's seat and the woman moved to the passenger seat. Tr. 36:20-22. The vehicle then pulled away from the Union Depot and headed out of downtown St. Paul. Tr. 37:1-2.

Officer Longen had already decided to have the vehicle stopped and searched. Tr. 36:3-9, 37:3-8. Officer Longen had made that determination based on his cumulative investigation and he intended the search to occur regardless of any alert from a K-9 sniff of the vehicle. Tr. 39:10-23. In particular, Officer Longen was aware that a Nissan Maxima has an empty space underneath the center console that narcotics traffickers can use to hide contraband and understood that if heroin is not in a vehicle for very long, the odor may not spread out in the vehicle enough for a dog to alert on its presence. Tr. 39:24-40:25.

VCET officers told Officer Whitney that they observed Mr. Thompson getting off the Megabus and believed he was carrying a large amount of heroin and was known to carry firearms. Tr. 38:4-14. They also told him that they were planning to search Mr. Thompson and the vehicle. Tr. 39:5-13. After Officer Whitney received the call from the VCET officers, he was near the east side of St. Paul. Tr. 61:20-62:14. He drove down to the area of the Union Depot so that he could conduct the traffic stop. Tr. 62:19-23. Over the radio, he heard that the Maxima left the Union Depot and was traveling over the Kellogg bridge onto Third Street. Tr. 65:9-17.

He caught up to the vehicle about 3 to 5 minutes after it left the Union Depot and activated his emergency lights. Tr. 37:9-38:2, 65:20-66:11. The Maxima did not stop immediately, but traveled at a slow pace for approximately a block after he activated the lights. Tr. 66:6-13. Officer Whitney and Officer Heroux, one of several other officers who arrived on the scene, spoke to the two occupants of the vehicle, Mr. Thompson and a woman identified as J.L.J., his significant other. Tr. 67:21-68:11. Officer Whitney testified that his goal during

the interaction was to make Mr. Thompson feel comfortable because he did not want the situation to escalate, creating a threat to public safety. Officer Whitney did this because he had been told about Mr. Thompson's firearms history and suspected possession of narcotics. Tr. 68:16-24. Officer Whitney told Mr. Thompson that he was being stopped for the tint on the vehicle's windows and because the vehicle did not have license plates. Tr. 68:25-69:3.

Officer Whitney asked Mr. Thompson where he was coming from. Tr. 68:25-69:3. Mr. Thompson stated that he had just dropped off his child near Maryland and White Bear Avenue. Tr. 69:4-11; Gov't Ex. 8 at 4-5. Mr. Thompson also mentioned that he and J.L.J. were on their way to get coffee and something to eat, but she wanted to change clothes before they did. Gov't Ex. 8 at 6. Based on the information Officer Whitney received about Mr. Thompson having gotten off the Megabus and the Maxima having left the Union Depot, Officer Whitney believed that Mr. Thompson was not telling the truth about dropping off his child. Tr. 69:12-14.

Officer Whitney had Mr. Thompson shut off the engine of the car and step outside the vehicle. Tr. 70:8-19. He told Mr. Thompson he was not under arrest and pat-searched him for weapons, but he found only a phone and some "blunts."[6] Tr. 70:22-71:1; Gov't Ex. 8 at 8. They had a conversation about Mr. Thompson's claim that he had just dropped off his child in an area that was far away from the place he was stopped. Tr. 71:8-21, Gov't Ex. 8 at 8-9.

During the stop, Officer Whitney eventually asked Mr. Thompson if there was anything illegal in the silver Maxima. Tr. 72:7-14; Gov't Ex. 8 at 10. Mr. Thompson had not been read any *Miranda*[7] warnings at this point. Tr. 72:15-16. Officer Whitney testified that he was concerned about the

---

[6]     There is no evidence that the "blunts" Mr. Thompson was carrying contained any illegal drugs.

[7]     *Miranda v. Arizona*, 384 U.S. 436 (1966).

contents of the vehicle because some heroin is laced with fentanyl and because a gun in the vehicle creates a safety concern. Tr. 72:17–73:1. Mr. Thompson said that there was nothing illegal in the car. Gov't Ex. 8 at 10. At that point, Officer Whitney went to speak to J.L.J., and asked her if there was anything illegal in the car. Gov't Ex. 8 at 13. Officer Whitney had J.L.J. exit the vehicle and explained to Mr. Thompson that he was going to have the dog go around the car to see if it alerted. Gov't Ex. 8 at 14. Mr. Thompson protested that there was an insufficient basis for the dog to sniff the vehicle. Gov't Ex. 8 at 14–15; Tr. 74:19–24.

Before the dog-sniff and before any officer went into the vehicle, Mr. Thompson stated: "My girls have their guns license.... She has a gun license." Tr. 78:19–21; Gov't Ex. 21. Officer Whitney asked if there was a gun in the car, and Mr. Thompson stated: "Yeah, but she has a gun license." Tr. 78:22–23; Gov't Ex. 8 at 16. Officer Whitney asked where the gun was, and Mr. Thompson told him that "[i]t's in the front seat in her bag." Tr. 79:1–; Gov't Ex. 8 at 16. Officer Whitney testified that he asked if there was a gun in the car because Thompson said that his J.L.J. had a gun permit and asked follow-up questions due to concerns for his own safety and that of the other officers. Tr. 80:6–21.

Officer Whitney then brought the dog around the car, but the dog did not react in a way that indicated any controlled substance was in the vehicle. Tr. 80:22–81:3. Nevertheless, Officer Whitney entered the vehicle, looked in the sling-style bag near the front seat, and found a TEC-9 firearm in it, along with several other items. Tr. 80:24–81:6. Officer Longen eventually arrived on the scene and located heroin that was hidden near the center console, which Officer Whitney removed from the vehicle. Tr. 82:20–83:11. Mr. Thompson was arrested.

677 Wells Search Warrant

Following the recovery of the gun and the heroin from the silver Maxima, Officer Longen believed that Mr. Thompson possessed other firearms at his residence. Tr. 41:25–42:10. On May 6th he applied for a search warrant for apartment 2 at 677 Wells. Tr. 42:11–14. In the affidavit, Officer Longen referred to ABC as a "confidential reliable informant." Gov't Ex. 6 at 2. Officer Longen testified that he referred to ABC in this way instead of as a "concerned citizen" because ABC had now provided information that led to an arrest. Tr. 44:7–24. As with Officer Longen's earlier search warrant applications in this matter, he discussed the information ABC provided about Mr. Thompson in February and March and his corroboration of several details. Gov't Ex. 6. At 2–3. He added information regarding the silver Maxima and the "search warrant for a phone ping" on the number ending in 3045. *Id.* at 3. The affidavit describes the events of May 3–6, 2018, including the pings received from the cell phone tracking that showed Mr. Thompson's phone travelled from the Union Depot to Chicago and back. *Id.* Officer Longen discussed the traffic stop of the silver Maxima, the search of the vehicle, and the recovery of a firearm and a large amount of heroin from under the center console. *Id.* at 3–4. He also explained that he had confirmed that Mr. Thompson lives at the 677 Wells apartment through surveillance and that ABC said Thompson uses apartment unit 2 to store weapons, large amounts of heroin, and currency obtained from narcotics distribution. *Id.* at 4.

The search of the residence resulted in the recovery of: a handgun; extended magazines; a black case that had been seen in the video provided by ABC; a bullet-style mixer with a white residue inside it, which is commonly used by narcotics traffickers for mixing heroin; ammunition; and information linking Mr. Thompson to the apartment. Tr. 42:24–43:17.

II.   **February 28th Warrants: Suppression is Not Required**

Mr. Thompson raises several arguments concerning the warrants issued on February 28, 2018 authorizing the tracking of his cellular phone and the green Maxima. For the reasons that follow, the Court concludes that suppression of evidence obtained from the execution of these warrants is not required.

A. Probable Cause

Mr. Thompson first argues that the February 28th tracking warrants for the 0727 cell phone and his vehicle were not based on probable cause. In the face of such a challenge, the Court's review is somewhat limited. "[A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review." *Illinois v. Gates*, 462 U.S. 213, 235 (1983). Rather, reviewing courts owe "great deference" to the issuing judge's determination of probable cause. *Id.* This Court's task, therefore, is to determine whether the affidavit "provides a substantial basis for finding probable cause to support the issuance of the search warrant." *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005) (internal quotation marks omitted). In assessing probable cause, the Court asks whether the totality of the circumstances demonstrates "a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* (internal quotation marks omitted).

Officer Longen's February 28th affidavits are somewhat thin. In both tracking warrants, Officer Longen explains that ABC provided him information linking Mr. Thompson to the distribution of heroin in St. Paul and his possession of firearms, but Officer Longen discussed corroborating only "innocent" details, facts that did not directly implicate Mr. Thompson in the sale of drugs.[8] Were

---

[8]   The showing of probable cause in these affidavits is lean despite that fact that Officer Longen had substantially more information he could have supplied to support the applications. Indeed, by February 28th, ABC had already given Officer Longen recent video footage from inside Mr. Thompson's apartment containing very incriminating evidence. Officer Longen may also have already

this Court reviewing these affidavits in the first instance, it might have required a more significant showing.  However, as the caselaw in this area makes clear, the Court's review must be deferential to the issuing judge's probable cause determination. Through that more deferential lens, and in light of controlling Eighth Circuit caselaw, the Court finds that Officer Longen's February 28th affidavits provided a substantial basis for the issuing judge to determine there was probable cause to issue these warrants.

The affidavits both state that ABC linked Mr. Thompson to distribution of heroin. Although the applications offer little corroboration for the assertion that Mr. Thompson "participates in the sale and distribution of heroin," Gov't's Ex. 1 at 2, Officer Longen did confirm several important pieces of information that ABC gave him about the target. Through surveillance and records checks, he determined that ABC gave accurate information about Mr. Thompson, including his appearance, approximate age, home address, and the vehicles Mr. Thompson was driving. The Eighth Circuit has stated that "[e]ven the corroboration of minor, innocent details can suffice to establish probable cause." *United States v. Tyler*, 238 F.3d 1036, 1039 (8th Cir. 2001). Contrary to Mr. Thompson's argument that Officer Longen confirmed only "innocuous" details provided by ABC, Def.'s Mem. at 11, the affidavits show that he also confirmed ABC

---

been in possession of a secret recording that ABC made of his conversation with Mr. Thompson discussing the WSP traffic stop, in which Mr. Thompson stated how much worse it would have been for him if he had the "work" with him. Officer Longen testified that he left these details out of the search warrants because he was "trying to protect the identity of the concerned citizen." Tr. 56:6–14. However, contrary to the government's suggestion, these facts cannot be factored into the Court's initial evaluation of whether the issuing judge had an adequate basis to determine the existence of probable cause because the Court's review is limited to information supplied to the issuing judge. *See* Gov't's Resp. at 11–12 (arguing that the probable cause was strong because of the video and audio recordings provided by ABC).

provided accurate information about Mr. Thompson's criminal history for drug-related offenses in the Chicago area.

In all, the corroboration of information provided by ABC in this case is stronger than that found sufficient in other relevant cases. *See, e.g., United States v. Murphy*, 69 F.3d 237, 240 (8th Cir. 1995) (finding affidavit that was "bare bones at best" nevertheless gave a substantial basis for a finding of probable cause where informant reported that Mr. Murphy had been released from prison after serving a sentence for murder and possessed firearms in his home, and officer confirmed he was recently released from prison following a murder sentence). The Court concludes that Officer Longen's verification of some of the information provided by ABC made it permissible for the issuing judge to infer that the informant was reliable as to the incriminating information for which no corroboration was provided. *See United States v. O'Dell*, 766 F.3d 870, 874 (8th Cir. 2014) ("The core question in assessing probable cause based upon information supplied by an informant is whether the information is reliable.... If information from an informant is shown to be reliable because of independent corroboration, then it is a permissible inference that the informant is reliable and that therefore other information that the informant provides, though uncorroborated, is also reliable."). The Court concludes that the affidavits in this case provided the requisite "substantial basis" for Judge Bartscher's finding of probable cause.

## B. "Concerned Citizen"

Mr. Thompson also argues that evidence should be suppressed because it was misleading for Officer Longen to refer to ABC as a "concerned citizen" in his affidavits. *See* Def.'s Mem. at 12–13. Mr. Thompson contends that Officer Longen used this term to improperly bolster ABC's credibility. *See id.* at 16. The Court disagrees that Officer Longen's description of his informant invalidated the warrants.

At the outset, the question of whether ABC is best described as a concerned citizen or something else is not properly before the Court. In *Franks v. Delaware*, 438 U.S. 153 (1978), the Supreme Court held that a criminal defendant is entitled to an evidentiary hearing regarding information contained in a warrant application if he "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included" in the affidavit. *Id.* at 155–56. If evidence from such a hearing shows the officer's perjury or reckless disregard for the truth by a preponderance of the evidence, then the false statements are excised from the warrant application and the reviewing court determines whether there would be independent probable cause for issuance of the search warrant in their absence. *Id.* *Franks* has been "extended ... to allow challenges to affidavits based on deliberate or reckless omissions." *United States v. Gater*, 868 F.3d 657, 659 (8th Cir. 2017).

Though Mr. Thompson asserts that Officer Longen's reference to ABC as a "concerned citizen" was misleading, he made no substantial showing of a reckless disregard for the truth or a deliberate or reckless omission. He did not request a hearing under *Franks*, and does not cite *Franks* in his post-hearing memorandum. Accordingly, the Court is limited to a review of the information within the "four corners" of the February 28th affidavits. *See United States v. Farlee*, 757 F.3d 810, 819 (8th Cir. 2014) ("When a magistrate relies solely on an affidavit to issue the warrant, only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause."); *United States v. Meyers*, No. 05-cr-68 (01-02) (JMR/RLE), 2005 WL 8163349, at *3 n.5 (D. Minn. June 1, 2005) ("Nothing presented by Meyers, either in the written Record, or at the Hearing, satisfies the requisite preliminary showing [under *Franks*].... Accordingly, we limit our review to the four corners of the Search Warrant.").

Even if the Court were to look behind the four corners of the affidavit and consider the broader record, the Court would not find that suppression of any

evidence is required as a result of Officer Longen's reference to ABC as a "concerned citizen." Calling ABC a "concerned citizen" in the February 28th affidavits may not have been the most precise phrase available, given ABC's criminal history and his sufficiently close ties to Mr. Thompson that he was able to obtain videos from inside his apartment and make a secret recording in which Mr. Thompson made incriminating statements.[9] However, Officer Longen testified that he chose the term in part because considers the difference between a "concerned citizen" and a "confidential informant" to be "negligible." Tr. 44:13–24. He thought it would be easier if he referred to ABC by the same terms throughout the warrant applications until the information ABC provided led to "actual arrests," at which point he believed the title "confidential reliable informant" became appropriate. *Id.* ABC was not paid for the information he supplied until March 7th. Tr. 43:23–44:1. When he first came forward, Officer Longen testified that ABC said he wanted to do the right thing. No evidence has been introduced to contradict this testimony. As a result, the record does not support a finding that it was misleading for Officer Longen to refer to ABC as a concerned citizen in his affidavit. Mr. Thompson has also failed to point to any evidence, and the Court finds there is none, that suggests Officer Longen chose not to mention ABC's criminal history in an effort to falsely bolster ABC's reliability.

Moreover, Officer Longen's "concerned citizen" reference and the omission of ABC's criminal history was not "clearly critical to the finding of probable cause." *United States v. Williams*, 477 F.3d 554, 559 (8th Cir. 2007) (noting that "recklessness may be inferred from the fact of omission of

---

[9]     *See United States v. Penman*, No. 2:00–cr–192C, 2001 WL 670922, at *6 (D. Utah May 3, 2001) (criticizing use of "concerned citizen" in an affidavit where the informant only learned the information provided through purchasing drugs, but concluding that the reference was permissible given that the affidavit disclosed the person obtained the information by buying drugs from the defendant).

information from an affidavit ... when the material omitted would have been clearly critical to the finding of probable cause") (internal quotations omitted). Mr. Thompson has failed to show that if the February 28th affidavits had labeled ABC as a "confidential informant," or anything other than a "concerned citizen," or mentioned ABC's criminal history, the affidavits would have been insufficient to support a finding of probable cause. *See United States v. Lakoskey*, 462 F.3d 965, 978 (8th Cir. 2006) (finding that the defendant was "unable to show that if the search-warrant affidavit contained the allegedly omitted information, it would not have been sufficient to support a finding of probable cause").

Mr. Thompson cites *United States v. Buchanan*, 167 F.3d 1207 (8th Cir. 1999), in support of his position that it was misleading to refer to ABC as a "concerned citizen." Unfortunately for Mr. Thompson, *Buchanan* does not help his position. In *Buchanan*, the Eighth Circuit affirmed the denial of Mr. Buchanan's motion to suppress evidence seized pursuant to a search warrant despite several misleading statements in the officer's supporting affidavit. 167 F.3d at 1208, 1210–11. In particular, the court found: "[t]he statement that the informant was a concerned citizen was misleading because it implied [the informant] was disinterested in the events described in the affidavit." *Id.* at 1210. In that case, the informant, Mr. Washington, had himself been questioned regarding suspected involvement in a crack-cocaine transaction, and in his statement to police, he implicated Mr. Buchanan. *See id.* at 1208. Though the Eighth Circuit found the officer's reference to Mr. Washington as a "concerned citizen" and other misstatements in the affidavit concerning, it upheld the district court's conclusion that there was sufficient probable cause in the warrant when the misleading information was excised. *Id.* at 1211. Unlike the circumstances in *Buchanan*, the record here does not support a finding that Officer Longen deliberately or recklessly misled the issuing judge by calling ABC a "concerned citizen." And in contrast to *Buchanan*, the record in this case does not suggest that ABC's cooperation in the first instance was done to deflect law enforcement interest in his own activities. Under these

circumstances, the *Buchanan* court's agreement that it was misleading to call Mr. Washington a concerned citizen is not a useful comparator for Officer Longen's use of that term to refer to ABC.[10] Moreover, the Eighth Circuit's conclusion that suppression was not required in *Buchanan* because the search-warrant affidavit otherwise established probable cause further supports this Court's conclusion regarding the showing in the February 28th warrants in this case.

### C. Cell-Phone Tracking Application

Mr. Thompson argues that Officer Longen's February 28th application for "An Order Authorizing The Installation And Use Of A Pen Register, Trap Device and Electronic Tracking Device On [the cell phone using the 0727] Telephone Number" violated his Fourth Amendment rights. Def.'s Mem. at 17–20. He asserts that the evidence seized as a result of this "Order" must be suppressed because the type of real-time cell-phone tracking it authorized required an application for a search warrant showing that there was probable cause. *Id.* The Court disagrees that the "Order" failed to comport with constitutional requisites.

It is true that the document used by Officer Longen might raise constitutional concerns upon initial examination. Officer Longen's application does not ask the issuing judge to sign a "search warrant." And the application references 18 U.S.C. § 3122, *see* Gov't Ex. 2 at 2, which authorizes a government attorney to apply for an order authorizing or approving the

---

[10]     Mr. Thompson also cites *United States v. Wilhelm*, 80 F.3d 116 (4th Cir. 1996), in which the Fourth Circuit found a search-warrant affiant's reference to a tipster as a "concerned citizen" misleading. *Id.* at 120–21. However, unlike in this case, the officer was only able to provide "minimal corroboration" that "the informant's directions to Wilhelm's home were correct." *Id.* As noted above, Officer Longen was able to corroborate several statements ABC made about Mr. Thompson so that it was reasonable for Officer Longen and the issuing judge to infer that ABC's statements that he was involved in distributing heroin were similarly reliable.

installation of a pen register or a trap and trace device based on only "a certification by the applicant that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by [a law enforcement agency]." 18 U.S.C. § 3122(b)(2).[11] This statute authorizes an order to be issued on a showing that "falls well short of the probable cause required for a warrant." *Carpenter v. United States*, 138 S. Ct. 2206, 2221 (2018) (citing a provision of the Stored Communications Act, 18 U.S.C. § 2703(d), which requires the same showing as § 3122(b)(2)). Moreover, the application here sought something far more intrusive than a pen register and trap and trace device; it also asked the issuing judge to allow law enforcement to obtain real-time GPS tracking data of the phone's location as well as the content of voicemails, text messages, images, etc. Gov't Ex. 2 at 8–9. Given the nature of the request, the Fourth Amendment was undoubtedly implicated and a warrant based on a showing of probable cause was required.

However, a closer examination of the documents actually used to obtain permission to track Mr. Thompson's cell phones reveal that they pass constitutional muster. When Judge Bartscher issued the Order, she specifically made the following finding:

> [T]he Court finds, on the basis of the information submitted by the applicant, *that there is probable cause* to believe that the information likely to be obtained by such installations and use is relevant to an ongoing criminal investigation into possible violation(s) by [Mr. Thompson] for facilitating the distribution of heroin in the Twin Cities metropolitan area.

---

[11]     The application also references Minn. Stat. § 626A.36, which allows a law enforcement officer to apply for an order authorizing the use of a pen register, trap and trace device, or mobile tracking device based on "a statement of the facts and circumstances relied upon by the applicant to justify the applicant's belief that an order should be issued." Minn. Stat. § 626A.36, subd. 2(2).

Gov't Ex. 2 at 8 (emphasis added). Although Officer Longen can best be described as having used an outdated form, Judge Bartscher's finding is sufficient to satisfy the Fourth Amendment's requirement that search warrants only issue upon a showing of probable cause. Because the issuing judge found that the affidavit showed probable cause, the Court concludes that the February 28th "Order" satisfies the warrant requirement.[12] *See United States v. Temple*, No. S1–4:15–CR–230–1 JAR(JMB), 2017 WL 7798109, at *30–36 (E.D. Mo. Oct. 6, 2017), *report and recommendation adopted*, No. 4:15–CR–230–JAR–L, 2018 WL 1116007 (E.D. Mo. Feb. 27, 2018) (assuming that the use of a cell-site simulator for real-time tracking of the defendant's cell phone was a Fourth Amendment search and finding no Fourth Amendment violation, in part, because the court order was supported by a sworn affidavit that established probable cause). Mr. Thompson points to no authority for the proposition that the use of an application form that could require less than a full probable cause showing somehow invalidates a warrant for which probable cause was explicitly found.

Because the "Order" was issued by a neutral and detached judicial officer who found that probable cause existed, Mr. Thompson's reliance on *Carpenter*, 138 S. Ct. 2206, is unpersuasive. In *Carpenter*, the Supreme Court held that: (1) a person has legitimate expectation of privacy in a historical record of his or her physical movements as captured by cell-site location information ("CSLI"); (2) when law enforcement officers obtain historical CSLI from a wireless carrier, that action constitutes a Fourth Amendment search; and (3) the government must generally obtain a search warrant based on a showing of probable cause before they can acquire historical CSLI. *Id.* Assuming that *Carpenter*'s conclusions regarding historical CSLI apply with equal force to law enforcement requests for real-time GPS tracking information, Officer Longen was required to

---

[12]   "For Fourth Amendment and exclusionary rule purposes, it does not matter that the document is not specifically denominated as a 'search warrant'...." *Temple*, 2017 WL 7798109, at *30.

obtain a search warrant supported by probable cause to lawfully track Mr. Thompson's phone. Because this Court has already concluded that February 28th affidavit supporting the request to track the 0727 cell phone provided a substantial basis for the issuing judge to find probable cause and the issuing judge specifically made a probable-cause determination, *Carpenter* does not require suppression of the evidence obtained pursuant to the February 28th tracking "Order."[13]

### D. The Good-Faith Exception

Finally, the Court concludes that even if the February 28th warrant applications failed to provide a substantial basis for the issuing judge to find probable cause, the evidence obtained pursuant to these warrants need not be suppressed based on the good-faith doctrine first described in *United States v. Leon*, 468 U.S. 897 (1984). In *Leon*, the Supreme Court held that the exclusionary rule does not require suppression of evidence obtained pursuant to a warrant if an officer obtains and executes the warrant in good-faith reliance on the issuing judge's determination of probable cause. *Id.* at 920–21. However, the good-faith exception does not apply, and suppression may still be an appropriate remedy, in the following circumstances: (1) where "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known as false except for his reckless disregard of the truth," *id.* at 923 (citing *Franks v. Delaware*, 438 U.S. 154 (1978)); (2) "in cases where the issuing magistrate wholly abandoned his judicial role," *id.*; (3) where the officer relied on a warrant based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," *id.* (internal quotations omitted); and (4) where the "warrant may be so facially deficient—i.e., failing to particularize the place to be

---

[13]     For these same reasons, the form of the April 2nd "Order" authorizing tracking of the 3045 cell phone does not violate Mr. Thompson's Fourth Amendment rights.

search or the things to be seized—that the executing officers cannot reasonable presume it to be valid," *id.*; *see also United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015). The Court finds that none of these circumstances are present in this case, and the good-faith doctrine applies.

Mr. Thompson argues that *Leon* does not apply for several reasons. First, he suggests that the alleged omissions and misstatements explored above mean that Officer Longen cannot be presumed to have been acting in good faith. However, as noted above, there has been no showing of a *Franks* violation in this case, and *Franks* is essentially coextensive with the first circumstance in which the good-faith doctrine does not apply. *See United States v. Puckett*, 466 F.3d 626, 630 (8th Cir. 2006) ("The Court in *Leon* cited four circumstances in which the good-faith exception does not apply: (1) when there is a *Franks* violation....").

Second, Mr. Thompson points out a likely typographical error in several of the search warrants and claims that the warrants "were not carefully reviewed." Def.'s Reply at 6–7. Assuming that this criticism is intended to suggest that the issuing judge abandoned the judicial role, the Court concludes that the presence of typographical errors does not support a finding that the issuing judge abandoned the judicial role or that it was objectively unreasonable for the officers to rely on the warrant. *See United States v. Stusinski*, No. 13-cr-135 (DWF/TNL), 2013 WL 6276380, at *1 (D. Minn. Dec. 4, 2013) (finding it "disconcerting that the warrant application is rife with apparent typographical errors, including the wrong address and dates," but concluding that those mistakes failed to make the issuance of the search warrant unconstitutional and that the *Leon* good-faith exception would apply even if the errors undermined the showing of probable cause).

As an additional challenge, Mr. Thompson also suggests that the tracking warrant for the green Maxima was so flawed that the officers executing them could not reasonably have presumed them to be valid because the warrant itself

was not signed until July 27th. Def.'s Reply at 6. Judge Bartscher signed the affidavit on February 28th, but inadvertently did not sign the warrant itself until June 27th, when Officer Longen realized the oversight and went back to the judge to have the warrant signed. Tr. 29:22–31:4. When she signed the warrant in June, she indicated that she had "approved and issued" the tracking warrant on February 28th. Gov't Ex. 5 at 6. Under these circumstances the Court cannot conclude that the warrant was so facially deficient that it was unreasonable for officers to reasonably believe the warrant was valid. *See United States v. Lyons*, 740 F.3d 702, 724–25 (1st Cir. 2014) (rejecting a defendant's challenge to the validity of a search warrant where the issuing judge signed the supporting affidavit, but did not sign the search warrant until after the search when officers realized the warrant had not been signed, and the judge added a note with the signature explaining the failure to sign was inadvertent); *see also United States v. Jackson*, 617 F. Supp. 2d 316, 323–24 (M.D. Pa. 2008) (citing cases finding officers reasonably relied on unsigned warrants under the good-faith exception and concluding that the officer's reliance on the unsigned warrant "was objectively reasonable because he 'participated in every step' of the issuance process and did not learn of the warrant's deficiency until well after the search had been conducted"); *but see United States v. Evans*, 469 F. Supp. 2d 893, 897, 900 (D. Mont. 2007) (holding that a search was warrantless and the good-faith exception did not apply because the officer's reliance on an unsigned warrant was not objectively reasonable). Although the Court wishes that Officer Longen had shown greater precision and care in his use of the proper form in this case, his review of the application for errors, and his review of the signatures on the documents in the end, these minor errors do not invalidate the warrants.

Finally, Mr. Thompson argues that the good-faith exception to the exclusionary rule does not apply because Officer Longen should have known that his search warrant affidavit did not provide probable cause. *See* Def.'s Mem. at 16–17. However, as explored above, the Court cannot find that the affidavit is so lacking in indicia of probable cause as to render official belief in its existence

entirely unreasonable. *Leon*, 468 U.S. at 923. This conclusion is strengthened by the reality that courts judge the objective reasonableness of an officer's reliance on a search warrant affidavit by looking "to the totality of the circumstances, including any information known to the officer but not presented to the issuing judge." *Jackson*, 784 F.3d at 1231; *see also United States v. Proell*, 485 F.3d 427, 431–32 (8th Cir. 2007) (concluding that officers executing search warrant were not entirely unreasonable for believing probable cause existed where officers knew additional information that was not provided to issuing state judge, but was made part of the record based on testimony at suppression hearing).

Looking at the full scope of information Officer Longen received from ABC, the Court easily concludes that his reliance on the February 28th warrants was objectively reasonable. In addition to ABC's reports that Officer Longen partially corroborated, ABC had also provided Officer Longen recent videos from inside Mr. Thompson's apartment and a secret recording following the WSP traffic stop. These audio and video recordings provided very strong support for ABC's statements that Mr. Thompson was engaged in the distribution of heroin and possessed firearms. This is not a situation where the information from an informant was so lacking in reliability that it was objectively unreasonable for an officer to present a search warrant affidavit to an issuing judge. *See United States v. Loud*, No. 17–cr–293 (ADM/LIB), 2018 WL 2095606, at *3 (D. Minn. Mar. 21, 2018) (affirming magistrate judge's conclusion that the good-faith exception did not apply where the officer presenting the search warrant affidavit had no additional information outside the affidavit to establish an anonymous informant's reliability). Indeed, this is a unique case in which an officer had virtually irrefutable evidence to bolster the credibility of an informant, but did not share that information with the judge issuing the warrant in order to protect his informant. The videos and audio recording strongly bolstered Officer Longen's belief in the validity of the warrant.

For these reasons, even if the February 28th affidavits had failed to establish probable cause, the Court concludes that Mr. Thompson's motion to

suppress evidence obtained pursuant to the tracking warrants for the 0727 cell phone and the green Maxima should nonetheless be denied under the good-faith exception to the exclusionary rule.

III.     April 2, 2018 Warrants: Suppression is Not Required

Mr. Thompson also challenges the validity of the warrants issued on April 2, 2018 that authorized tracking of his silver Nissan Maxima and his cellular phone with the phone number ending in 3045. However, these warrants were valid and suppression is not required for the same reasons that the seizure of evidence pursuant to the February 28th warrants did not violate Mr. Thompson's constitutional rights.

A. Probable Cause

The information in Officer Longen's affidavits supporting the GPS tracking of Mr. Thompson's silver Maxima and the 3045 cell phone largely mirrors that included in his February 28th affidavits. Both sets of affidavits describe the information provided by ABC about Mr. Thompson's involvement in the distribution of heroin in the Twin Cities, the location of his apartment, his Saturn and the Nissan Maxima with license plate AKS-913, and previous drug-related arrests in the Chicago area. And all four affidavits include a description of the corroboration Officer Longen was able to obtain through his own surveillance and records investigations.

In the GPS tracking warrant for the silver Maxima, Officer Longen added that ABC had learned in the middle of March 2018 that Mr. Thompson purchased a newer silver Maxima that he was using to travel to and from Chicago to pick up heroin for distribution in the Twin Cities. Officer Longen verified through surveillance that Mr. Thompson was indeed driving a newer silver Maxima fitting the description provided by ABC. Officer Longen also stated that he was able to verify through contacts at the DEA that the green Maxima had been seen in the Chicago area at an address known to be associated with him, further corroborating information provided by ABC. He also noted that the DEA contact

confirmed that the green Maxima had been frequenting areas known to be controlled by gangs involved in the distribution of heroin. Gov't Ex. 3 at 3.

With respect to the 3045 cell phone, Officer Longen stated in his affidavit that ABC provided him with the new phone number, had communicated with Mr. Thompson at that number, and that Mr. Thompson was using the number to communicate when he conducts "narcotics distribution related activities." Gov't Ex. 4 at 3. Moreover, a records check revealed that the 3045 cell phone number was registered under the name Mike Jones, which was consistent with the registration information connected to the 0727 cell phone. *Id.* at 4.

Given the significant deference owed to the issuing judge by a reviewing court, the Court finds that the April 2nd tracking warrants for the silver Maxima and the 3045 cell phone provided a substantial basis for the issuing judge to find probable cause. Officer Longen's corroboration of multiple pieces of information provided by ABC support the issuing judge's probable-cause determination and the affidavits adequately established ABC's reliability as to other uncorroborated details.

## B. Continuing References to ABC as a Concerned Citizen

Officer Longen's April 2nd affidavits continued to refer to ABC as a concerned citizen. Mr. Thompson suggests that these continuing references were misleading because ABC had by that point already become a paid informant and asked Officer Longen to speak with his probation officer to see if he could shorten his probationary term. *See* Def.'s Mem. at 13–15.

The fact that Officer Longen did not disclose the payment arrangement with ABC and did not reveal ABC's request for assistance with his probationary period causes the Court additional concern. But Mr. Thompson does not assert that these omissions constitute a *Franks* violation. He made no showing of intentional or reckless disregard for the truth on the part of Officer Longen, despite exploring these matters with him during cross examination at the

evidentiary hearing. He also did not request a *Franks* hearing. As noted above, absent any *Franks* showing, the Court's review is limited to the deferential consideration of whether the probable cause shown on the face of the affidavit supported issuance of the warrants. Even if the Court were to look behind the four corners of the April 2nd warrants, there is no evidence in the record supporting a finding of intentional misrepresentations or reckless omissions. Based on Officer Longen's testimony regarding these matters, his "concerned citizen" label was reasonable (though imprecise), and there is no support in the record to suggest he intentionally or recklessly omitted criminal-history information or ABC's request for a shorter probation. The record simply does not support a finding that any *Franks* violations weaken the affidavits.

Moreover, the April 2nd affidavits would still be supported by probable cause even if Officer Longen's affidavit had referred to ABC as a "paid informant," included his criminal history, and disclosed that ABC asked for assistance with his probation. *Franks*, 438 U.S. at 156 (providing that a warrant is void and evidence obtained pursuant to it should be excluded where an affidavit is insufficient to establish probable cause after misrepresentations are removed); *Buchanan*, 167 F.3d at 1210 (same, citing *Franks*); *see also United States v. Williams*, 477 F.3d 554, 558–59 (8th Cir. 2007) (concluding that affidavit's omission of the terms of an informant's agreement and criminal background was insufficient to undermine his reliability). The probable-cause showing for each of the April 2nd warrants was sufficient independent of the allegedly misleading omissions.

## C. The Good-Faith Exception

Finally, suppression of the evidence obtained pursuant to the April 2nd warrants is unwarranted because it was objectively reasonable for the officers to rely on the April 2nd warrants. On this record, the Court cannot find that any of the four circumstances exists in which law enforcement is not entitled to rely on a search warrant. Mr. Thompson has demonstrated no *Franks* violation; there

is no suggestion that the issuing judge abandoned the judicial role; the warrant itself is not facially invalid; and the affidavit is not so lacking in probable cause that belief in its existence would be entirely unreasonable. *Leon*, 468 U.S. at 923.

With respect to the adequacy of the probable-cause showing, as noted above, the Court considers the totality of the circumstances, including the information that Officer Longen knew, but did not share with the issuing judge. *Jackson*, 784 F.3d at 1231. Of course, Officer Longen knew about the videos taken inside Mr. Thompson's apartment and the recording of his phone call with ABC after the traffic stop by the WSP in late February. But by the time he applied for and executed the April 2nd warrants, Officer Longen had learned even more. Although a March 5th traffic stop of Mr. Thompson's vehicle arranged by Officer Longen failed to turn up evidence of narcotics trafficking or firearms, ABC gave Officer Longen a recording of another conversation he had with Mr. Thompson on March 6th. During the lengthy recording, Mr. Thompson discusses his suspicion that he is being investigated, his efforts to avoid surveillance, that he luckily avoided being caught with a significant amount of heroin in his vehicle during the March 5th stop, and the superior quality of the narcotics he was distributing. He also discussed increasing profits from drug transactions by diluting the concentration of heroin he sold to his customers. Taking these additional details into account, the Court concludes that the good-faith exception would save the April 2nd warrants even if the showing of probable cause was insufficient.

## IV.   The May 6th Traffic Stop, Vehicle Search, and Arrest

Mr. Thompson next argues that the stop of the silver Maxima on May 6th was unlawful because it was the fruit of the illegal GPS tracking of the silver Maxima and the 3045 cell phone. Def.'s Mem. at 21. Therefore, he contends that the "stop, arrest, and the search of his vehicle are fruit of the unlawful tracking and the evidence seized on May 6, 2018 must be suppressed." *Id.* In addition,

Mr. Thompson contends that his warrantless public arrest was not based on probable cause because Officer Longen had failed to adequately corroborate incriminating information provided by an unreliable informant. *Id.* at 22–25.

### A. Fruit of the Poisonous Tree

Under the fruit–of–the–poisonous–tree doctrine, suppression is the appropriate remedy not only for the evidence directly obtained as the result of a Fourth Amendment violation, but also evidence that flows indirectly from unlawful searches and seizures. *Wong Sun v. United States*, 371 U.S. 471, 484–88 (1963); *United States v. Tuton*, 893 F.3d 562, 568 (8th Cir. 2018) ("The exclusionary rule extends to 'evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'") (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)). However, the Court has concluded above that the warrants issued on February 28th and April 2nd were valid. Therefore, the Court necessarily rejects Mr. Thompson's argument that the May 6th stop of his silver Maxima, its subsequent search, and his arrest are fruit of any original illegality.

### B. Probable Cause for the Vehicle Stop and Search

Mr. Thompson argues that officers did not have reasonable articulable suspicion or probable cause to stop and search the silver Maxima on May 6th. Def.'s Mem. at 22–25. The Court disagrees. Both the stop and the search of the vehicle were constitutionally permissible because officers had probable cause to believe that Mr. Thompson was transporting illegal drugs and that a search of the vehicle would reveal contraband or other evidence of drug trafficking.

Officers may search a vehicle without a warrant so long as the officers have probable cause to believe that the car contains contraband or other evidence of criminal activity. *United States v. Edwards*, 891 F.3d 708, 712 (8th Cir. 2018) ("Under the automobile exception to the warrant requirement, officers may conduct a warrantless search of a vehicle if they have probable cause to

believe that the car contains contraband or other evidence."). Given the totality of the circumstances, the information Officer Longen obtained throughout his investigation provided ample probable cause to stop the silver Maxima and search it for evidence of drug trafficking. As discussed above, by May 6th, Officer Longen had repeatedly received trustworthy information from ABC. Not only had Officer Longen's investigation to that point corroborated much of ABC's information, but ABC had given Officer Longen video and audio recordings that strongly indicated Mr. Thompson was involved in the distribution of heroin in St. Paul. One of the videos ABC provided showed Mr. Thompson engaged in a drug transaction inside his apartment. Tr. 56:15–25. Indeed, Officer Longen had videos from inside Mr. Thompson's apartment suggesting that ABC was in general providing truthful information about Mr. Thompson's involvement in heroin distribution. Mr. Thompson's movements from May 3rd through the 6th leading up to the stop of the vehicle—his trip on the Megabus to Chicago and back again—also aligned with the information ABC provided about how he transported drugs from Chicago to the Twin Cities. ABC also gave Officer Longen a March 6th recording in which Mr. Thompson discussed the previous day's traffic stop and a hiding place inside a Nissam Maxima that allowed him to transport a large amount of heroin that law enforcement was unable to detect. And law enforcement observed Mr. Thompson get into the silver Maxima immediately upon returning from his trip to Chicago.

Even though Officer Longen may not have had irrefutable proof that Mr. Thompson was indeed transporting heroin at the time of the May 6th stop and search of the vehicle, that is not what probable cause requires. *Edwards*, 891 F.3d at 711 (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018)). Based on the totality of the circumstances, the Court concludes that the information available to the officers created a fair probability that a search of the silver Maxima would reveal contraband or other evidence.

V.    Mr. Thompson's May 6th Statements

Mr. Thompson argues that the statements he made on May 6th during the stop conducted by Officer Whitney must be suppressed because he was in custody and was not advised of his *Miranda* rights prior to being questioned about the contents of the vehicle. Def.'s Mem. at 26–30. The government acknowledges that no *Miranda* warnings were given, but argues that Mr. Thompson was not in "custody" at the time he made statements to the police who stopped his vehicle, so such warnings were not required. Gov't Resp. at 30–35. The government also argues that Mr. Thompson was not being interrogated at the time he made his statements. *Id.* at 35–36. Finally, the government argues that even if Mr. Thompson was subjected to custodial interrogation, the public-safety exception to *Miranda* applies in this context. *Id.* at 36–38. The Court disagrees with the government in several respects and concludes that some of Mr. Thompson's statements must be suppressed.

A. Custody

The familiar *Miranda* warnings are required when an individual is in custody. *Miranda*, 384 U.S. at 444; *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam). In determining whether a person is "in custody" for purposes of *Miranda*, the "ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1985). Courts must consider the totality of the circumstances, but the focus is not on the subjective views of either the officers or the person being questioned. *United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004) (en banc) (citing *Stansbury v. California*, 511 U.S. 318, 322–23 (1994) (per curiam)).

Nearly 30 years ago, the Eighth Circuit identified five non-exclusive factors that courts should consider in determining whether a suspect is in custody for purposes of *Miranda*:

(1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Griffin*, 922 F.2d 1343 (8th Cir. 1990). If the first three factors are present they suggest that an individual is not in custody at the time of questioning. *United States v. Laurita*, 821 F.3d 1020, 1024 (8th Cir. 2016). The latter three factors suggest that the situation was more coercive, indicating that an individual was in custody. *Id.*

Considering the *Griffin* factors and focusing on the "touchstone" inquiry of whether Mr. Thompson "was restrained as though he were under formal arrest," *Laurita*, 821 F.3d at 1024, the Court concludes that Mr. Thompson was in custody for purposes of *Miranda*, so he was entitled to be advised of his rights prior to any interrogation. First, although Mr. Thompson was told that he was not under arrest, he also was not informed that he was free to leave or that he could choose not to respond to the officers' questions. This factor thus weighs neither squarely for nor clearly against a finding of custody.

Second, Mr. Thompson was not handcuffed until he was placed under formal arrest, but he did not possess unrestrained freedom of movement during the encounter. Indeed, Officer Whitney testified, and the video footage of the incident confirms, that Mr. Thompson was directed where he could stand, where he could lean, and where he was allowed to go when the K-9 unit performed the drug sniff on the silver Maxima. Further, the testimony at the evidentiary hearing indicates that when J.L.J. asked for permission to enter her nearby house, she was not allowed to. Nor was Mr. Thompson allowed to leave when he

asked why he was being detained if he was not under arrest and there was no warrant. Tr. 91:11–19; Gov't Ex. 7 at 7:50–8:10. Because he did not possess freedom of movement during the encounter, this factor supports rather than mitigates a finding of custody.

Third, Mr. Thompson did not initiate contact with the police or volunteer to participate in a police interview. Officer Whitney stopped his vehicle by activating the emergency lights on his squad vehicle. Then two officers approached the car and began speaking to the occupants of the silver Maxima. The officers then questioned Mr. Thompson for several minutes about where he and his girlfriend had been that morning, seeking explanations to answers that did not seem plausible given where the vehicle was stopped. These facts point toward a finding of custody as well. As for the fourth factor, though the record does not reveal the use of any "strong arm tactics," the officers were not honest about the reason for the stop or about their knowledge of where the Maxima had recently been. As a result, this factor weighs somewhat against and somewhat in favor of a finding of custody.

The fifth factor points toward a finding of custody. Although Officer Whitney testified that he was trying to make Mr. Thompson comfortable during the stop to avoid an incident that might jeopardize public safety, from the perspective of a reasonable person, the atmosphere around the vehicle during the course of the stop was very clearly police dominated. Three squad cars were on the scene very shortly after Officer Whitney initiated the stop. There were several armed officers at the scene as well as a police K-9. A reasonable person who is informed that he has been stopped for overly tinted windows and a failure to display license plates does not expect such a strong law enforcement presence. Nor would a reasonable person believe he was free to leave when the officers on the scene refused to allow him or his girlfriend to enter their home or make contact with family members who were watching the scene. Finally, the sixth *Griffin* factor weighs toward a finding of custody because Mr. Thompson

was placed under arrest at the end of the police questioning and search of his vehicle.

The government asserts that this case is like *Berkemer v. McCarty*, 468 U.S. 420 (1984), in which the Supreme Court concluded that a suspect was not in custody for purposes of *Miranda* during a roadside stop. However, the government's comparison of *Berkemer* to this case elides meaningful differences in the circumstances. Unlike this case, where three officers were almost immediately on the scene along with a police dog, only one officer, Trooper Williams, participated in the traffic stop of Mr. Berkemer's vehicle. 468 U.S. at 423. In addition, the officers' refusal to allow Mr. Thompson's girlfriend to go into her house in this case has no analogue in the facts present in *Berkemer*. Therefore, this is not a situation where the totality of the circumstances suggests that "a single police officer asked respondent a modest number of questions and requested him to perform a simple balancing test at a location visible to passing motorists." *Id.* at 442. Though the stop was in public and the questioning was not overly long, a reasonable person in Mr. Thompson's position would not believe he was free to end the encounter and go on about his business.

The totality of the circumstances here points only to a conclusion that Mr. Thompson was in custody at the time he was questioned during the stop of the silver Maxima. Having been instructed to exit his vehicle, where three squad cars and a police dog were on the scene, having his movements directed throughout the encounter, receiving no permission to go when he asked why he couldn't be on his way, and after his girlfriend was told she could not go into her own house, no reasonable person in Mr. Thompson's position would have believed he was free to end the encounter and walk away. Accordingly, the Court finds he was restrained as though he was under formal arrest.

## B. Interrogation

The inquiry about whether a *Miranda* violation occurred does not end with the finding of custody. In addition to a custodial atmosphere, "*Miranda* rights are triggered only when a defendant is being interrogated...." *United States v. Swift*, 623 F.3d 618, 622 (8th Cir. 2010). Interrogation occurs when a person is subject to "either express questioning or its functional equivalent, which includes any words or actions on the part of police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *United States v. Jackson*, 852 F.3d 764, 771 (8th Cir. 2017) (citing *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980)). A suspect is not being interrogated when he makes voluntary statements that are not in response to express questioning or its functional equivalent. *See Swift*, 623 F.3d at 622 (citing *United States v. Hatten*, 68 F.3d 257, 262 (8th Cir. 1995), and *Innis*, 446 U.S. at 299).

Near the 11th minute of the stop, after Mr. Thompson has been removed from the car, Officer Whitney explains that he is going to have his K-9 go around the car and Mr. Thompson protests that no probable cause exists for the dog to sniff the vehicle. Gov't Ex. 7 at 10:30–11:00. Another officer then tells Mr. Thompson, that if there's nothing in the car for you to worry about, then it's all good and you'll be on your way. *Id.* at 11:00–11:06. At that point, Mr. Thompson states, "[w]ell listen ... My girl has a gun license," and Officer Whitney asks him what he said. *Id.* at 11:06–11:10. Mr. Thompson again states, "she has her gun license," and Officer Whitney asks, "Ok, is there a gun in the car?" *Id.* at 11:11–11:13. Mr. Thompson responds that there is a gun in the car, Officer Whitney asks him where the gun is located, and Mr. Thompson tells him the gun is in his girlfriend's bag. *Id.* at 11:13–20. This sequence of events demonstrates that Mr. Thompson was expressly questioned about the contents of the vehicle before making a statement about the presence of a firearm in the vehicle. Accordingly, he was subject to interrogation.

The government argues that that Mr. Thompson was not being interrogated because Mr. Thompson "volunteered that J.L.J. had a permit to carry a firearm." Gov't Mem. at 35. The government contends that "[Officer] Whitney's follow up questions were not 'express questioning' or 'reasonably likely to elicit an incriminating response' from Thompson," because "[Officer] Whitney was assessing the safety for himself, his fellow officers, and the drug dog before moving forward with a sniff of the vehicle." *Id.* at 35–36. Perhaps conflating the question of interrogation with the public-safety exception explored below, the government makes no effort to explain how the officers' direct question: "Is there a gun in the car?" does not amount to express questioning, and the Court disagrees with the government's assertion. To the extent the government looks at the encounter from only the perspective of Officer Whitney, the law requires the focus to be placed instead on the person being questioned. *See Innis*, 446 U.S. at 301 (indicating that the portion of the definition of interrogation asking whether police words or actions are reasonably likely to elicit an incriminating response requires a focus "primarily upon the perceptions of the suspect, rather than the intent of the police"). Moreover, in determining whether this case involved any "interrogation," it does not matter that Officer Whitney subjectively believed that he was concerned for his own safety and that of others when he asked whether a gun was in the vehicle. Instead, the issues is that the direct question Officer Whitney asked was reasonably likely to elicit an incriminating response. Therefore, interrogation occurred.

### C. Public Safety Exception

The Court's conclusion that Mr. Thompson was subject to custodial interrogation does not end the *Miranda* inquiry in this case. The Court must also determine whether *Miranda*'s public-safety exception applies in this case. For the reasons set forth below, the court concludes that the public-safety exception applies to some, but not all of the statements made by Mr. Thompson during the stop.

In *Quarles v. New York*, 467 U.S. 649 (1984), the Supreme Court recognized a limited public-safety exception to the requirement that a person subjected to custodial interrogation must be advised of his rights pursuant to *Miranda* before his statements can be used against him during a criminal trial. In *Quarles*, Officer Kraft and his partner were responding to a report that a young woman had been the victim of a rape committed by a man carrying a gun who had just entered a nearby supermarket. *Id.* at 651. The officers went to the supermarket and saw a man matching the description of the suspect, Mr. Quarles, who ran toward the rear of the store when he spotted one of the officers approaching. *Id.* at 651-52. After briefly losing sight of Quarles, Officer Kraft caught up to him and ordered him to stop and put his hands over his head. *Id.* at 652. After Quarles was handcuffed, and Officer Kraft noticed he had an empty shoulder holster and asked him where the gun was, but he did not inform him of his *Miranda* rights. *Id.* Mr. Quarles indicated that the gun was among some nearby empty cartons and said, "the gun is over there." *Id.* Based on these facts, the Supreme Court held that "there is a 'public safety' exception to the requirement that Miranda warnings be given before a suspect's answers may be admitted into evidence, and that the availability of the exception does not depend upon the motivation of the individual officers involved." *Id.* at 655-56. The Supreme Court reasoned that such an exception was warranted, even if the officer asked the question for a partially investigative reason, because "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Id.* at 657. However, the exception does not apply to "questions designed solely to elicit testimonial evidence from a suspect." *Id.* at 659.

Eighth Circuit caselaw broadly applying the public-safety exception t recognized in *Quarles* compels the conclusion that Mr. Thompson's statements about the gun in the car are admissible. First, in *United States v. Williams*, 181 F.3d 945 (8th Cir. 1999), the Eighth Circuit applied the public-safety exception

to very similar facts. *Id.* at 953–54. Officers executed a search warrant at Mr. Williams's apartment after learning, *inter alia*, that he had a criminal history, including unauthorized use of weapons. *Id.* at 947–48. When they entered the apartment using a "flash bang" grenade, they found Mr. Williams lying on a bed and handcuffed him. *Id.* at 948. With his hands secured behind his back and without reading *Miranda* warnings, the officers asked Mr. Williams if there was anything in the apartment the officers "need[ed] to be aware of," prompting Mr. Williams to mention that a gun was in the closet. *Id.* The court found that Mr. Williams's statement was admissible under the public–safety exception because "public safety concerns were an issue"; the court reasoned that although Mr. Williams was handcuffed when asked if officers needed to be aware of anything in the apartment, "the officers could not have known if any armed individuals were present in the apartment or preparing to enter the apartment within a short period of time." *Id.* at 953–54. Relying on the balancing of interests that motivated the Supreme Court's decision in *Quarles*, the court also noted that although the officers asked a broadly worded question, rather than one specifically mentioning firearms, "the question sought information related to weapons or other safety concerns." *Id.* at 953 n.13.

In *United States v. Luker*, 395 F.3d 830 (8th Cir. 2005), the Eighth Circuit again considered the public–safety exception, this time in the context of a road–side traffic stop. *Id.* at 832, 833–34. The officers who stopped his vehicle placed Mr. Luker under arrest for "driving drunk." *Id.* at 832. They knew that Mr. Luker had a history of methamphetamine use and, before he was *Mirandized*, asked him "if there was anything in [the] vehicle that shouldn't be there or that they should know about." *Id.* Mr. Luker admitted that there was a shotgun in the car, which the officers located in the trunk. *Id.* Mr. Luker was charged with being a felon in possession of a firearm. *Id.* He moved to suppress his statement about the firearm, but the district court "determined that the officer's question fell within the public safety exception to *Miranda* and denied [the motion]." *Id.* Citing *Quarles* and *Williams*, the Eighth Circuit upheld the application of the

public-safety exception because "[t]he officers were aware of Luker's history of methamphetamine use and were concerned about needles or substances associated with such use in the car and thus the question concerning the contents of the vehicle was warranted." *Id.* at 833–34.

In *United States v. Liddell*, 517 F.3d 1007 (8th Cir. 2008), the court again affirmed denial of a motion to suppress statements based on the public-safety exception to *Miranda*. *Id.* at 1008. There, officers stopped a vehicle for "a loud music violation," and when they realized that Mr. Liddell was not permitted to drive in Iowa, he was arrested, pat-searched (revealing a bag of marijuana, cash, and cell phones), and placed in a patrol car. *Id.* at 1008. The officers searched Mr. Liddell's car incident to his arrest, discovering a firearm under the front seat. *Id.* At that point, before advising him of his rights pursuant to *Miranda*, officers asked Mr. Liddell if there was anything else in the vehicle that they needed to know about or that was going to hurt them and mentioned that they had found the firearm already. *Id.* Mr. Liddell made certain incriminating statements about the firearm the officers had just located. *Id.* Mr. Lidell was charged with being a felon in possession of a firearm and moved to suppress his post-arrest statements. The district court denied the motion based on the public-safety exception and the Eighth Circuit affirmed, stating:

> Our prior cases recognized that the risk of police officers being injured by the mishandling of unknown firearms or drug paraphernalia provides a sufficient public safety basis to ask a suspect who has been arrested and secured whether there are weapons or contraband in a car or apartment that the police are about to search.

*Id.* at 1009–10. The court explained "when the officers found Liddell's concealed .38 caliber revolver, they had good reason to be concerned that additional weapons might pose a threat to their safety when they searched Liddell's car incident to a late-night arrest." *Id.* at 1010.

The Court concludes that Mr. Thompson's statements in response to Officer Whitney's questions—"Is there anything illegal in the car?"; "Is there a gun in the car?"; and "where's the gun at?"—are admissible under the public-safety exception to *Miranda*. As defined by the Eighth Circuit, public-safety concerns were presented in this case. The officers had received reliable information that Mr. Thompson was involved in the distribution of heroin and the same informant advised them that he carried guns on his person. A firearm was visible in one of the videos that ABC provided Officer Longen, and Officer Whitney had been advised that Mr. Thompson was known to carry firearms on his person. Tr. 38:9–14, 63:10–14. In addition to the concern about the possible presence of firearms, the officers reasonably believed that Mr. Thompson was transporting heroin in the silver Maxima. Testimony at the evidentiary hearing also suggested that Officer Whitney was concerned that heroin laced with fentanyl could pose a safety risk to him or his K-9 partner. Tr. 72:17–73:1. Based on the decisions in *Williams*, *Luker*, and *Liddell*, these are public-safety concerns that justify the officers' questioning prior to providing *Miranda* warnings. *See also Quarles*, 467 U.S. at 657 (explaining that where such a public-safety issue is presented, the need for law enforcement to obtain answers outweighs *Miranda*'s prophylactic rule). Accordingly, Mr. Thompson's answers to these questions may be admitted at trial despite the fact he was not provided *Miranda* warnings, and his motion to suppress should be denied in part.

The Court's conclusion that the public-safety exception permits introduction of Mr. Thompson's un-*Mirandized* statements concerning the presence of the gun in the vehicle does not apply to the other statements made during the stop. The government does not argue that the public-safety exception allows admission of any other answers Mr. Thompson made in response to questioning during the May 6th stop. For example, the government makes no suggestion that there was a concern for public safety motivating repeated questioning of Mr. Thompson about where he had been just before Officer Whitney initiated the stop. Nor does the government suggest that the

public-safety exception would allow Mr. Thompson's statements in response to questions about the type of gun license J.L.J. purportedly had. *See* Gov't Ex. 8 at 19. Mr. Thompson's motion to suppress statements should be granted to the extent he asks the Court to preclude the government from using these statements he made during the stop against him, and any other statements beyond the narrow inquiry about the presence of the gun in the car.

## VI. The May 6th Search Warrant for Mr. Thompson's Residence

Finally, Mr. Thompson argues that the evidence seized pursuant to the execution of the May 6th search warrant for his apartment at 677 Wells should be suppressed. Def.'s Mem. at 30–31. He asserts that the May 6th warrant is the fruit of the unlawful tracking of his vehicles and phones pursuant to invalid searches pursuant to the February 28th and April 2nd warrants, the invalid stop of the silver Maxima on May 6th, and his un-*Mirandized* statements during the stop. *Id.* For all the reasons set forth above, the Court finds that there was no violation of Mr. Thompson's constitutional rights with respect to the searches conducted pursuant to the February 28th and April 2nd warrants. Nor were his rights violated as a result of the stop and search of the silver Maxima. His statements about the presence of a firearm in the vehicle were also properly obtained pursuant to the public-safety exception to *Miranda*. The affidavit in support of the May 6th search warrant sets forth a substantial basis for the issuing judge to find probable cause to search Mr. Thompson's apartment, and does so without using information gathered as a result of any constitutional violation. Mr. Thompson's request for suppression of the evidence obtained pursuant to this warrant should be denied.

## VII. Recommendation

Based on the above analysis, the Court makes the following recommendations. Mr. Thompson's motion to suppress search and seizure evidence **(ECF No. 25)** should be **DENIED**. His motion to suppress statements **(ECF No. 24)** should be **GRANTED IN PART** and **DENIED IN PART** as set forth in

Part V.C. of this decision. Specifically, Mr. Thompson's statements in response to questions regarding the presence of a firearm or anything illegal in the vehicle may be admitted pursuant to the public-safety exception to *Miranda*. His statements in response to other questioning during the May 6, 2018 traffic stop should be suppressed.

Date: January 7, 2019                    *s/Katherine Menendez*
                                         Katherine Menendez
                                         United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.